JoAnn RENFROW, Owner J & G Landscaping, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–1050C.

United States Court of Federal Claims.

Aug. 18, 1997.

Lyle H. Moe, Grand Forks, ND, for plaintiff.

Thomas O. Mason, Washington, DC, with whom were Assistant Attorney General, Frank W. Hunger, Director, David M. Cohen and Assistant Director Kirk T. Manhardt, for defendant. Captain Rebecca E. Pearson, Air Force Legal Services Agency, of counsel.

## *OPINION*

LYDON, Senior Judge:

### INTRODUCTION

Plaintiff (Ms. Renfrow), owner of J & G Landscaping—a North Dakota landscaping company, seeks to recover breach of contract damages from the Government arising out of a grounds maintenance service contract plaintiff had with the Grand Forks Air Force Base (Base) in North Dakota. Defendant has moved for summary judgment, supporting its motion with contract materials, excerpts from depositions, a declaration, and other related materials. In its motion, defendant stresses the nature of the contract in issue (a requirements contract), the uncontested fact that plaintiff has been paid for all the work plaintiff performed under the contract, and the uncontested fact that the work required of plaintiff under the contract never exceeded the estimated quantities set forth in Schedule B of the contract.

Plaintiff opposes defendant's motion claiming that there are genuine issues of material fact in dispute and thus summary judgment is inappropriate. The primary issue, according to plaintiff, is whether plaintiff, when preparing her company's bid, relied on maps containing erroneous acreage estimates. Plaintiff contends that defendant was negligent in preparing the solicitation package, on which plaintiff claims she relied in preparing her bid, by making these maps containing erroneous acreage figures part of the solicitation package and thereby misleading plaintiff to her detriment. In support of her opposition, plaintiff has presented contract documents, excerpts from interrogatories and depositions, affidavits, statements, and related materials.

Defendant's response to plaintiff's opposition asserts that the maps referred to above and appended to the solicitation package did not contain any acreage estimates. Defendant maintains that these maps merely reflected the total area of the base covered by the contract but did not reflect the acreage on the base or of any area pertinent to this law suit. Defendant avers that the only acreage estimates available in the solicitation package for bid purposes were to be found in Schedule B of the contract.

It is uncontested that *after* the contract was awarded to plaintiff, Modification No. 4 was issued which replaced the maps which accompanied the original solicitation with maps which did contain acreage figures applicable to certain designated areas (zones) on the Base which were to be the subject of mowing services by plaintiff. Defendant maintains that the original solicitation maps did not contain any acreage figures for purpose of contract performance. Plaintiff suggests the maps she received in the solicitation package did contain therein acreage figures. At first blush, it would appear that there is a genuine issue of material fact in dispute. A close examination of the materi-

als supplied by the parties and careful consideration of counsels' presentations at oral argument persuade the court that this case is subject to disposition by summary judgment.

## FACTS

Prior to 1990, grounds maintenance service work at Grand Forks Air Force Base (Base) was awarded at a firm-fixed price on a per month basis and included all mowing areas on the Base, with the exception of a few identified areas. Ground maintenance service contracts on the Base were not priced on a per acre basis for the mowing of grass. This procurement method changed in 1990.

On September 15, 1989, the Base issued solicitation No. F32605–89–B0027 (Sol.B0027) for grounds maintenance service on the Base for the Basic Year 16 Mar. 1990, and four subsequent Option Years. The proposed contract was to be a requirements contract and thus incorporated the Federal Acquisition Regulation (FAR) requirements clause as a contract provision. That provision read, in pertinent part as follows:

(a) This is a requirements contract for the supplies on the services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Delivery–Order Limitations clause or elsewhere in the contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the schedule.

(d) The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract. FAR 52.217–21

The proposed contract also contained a Delivery Order Limitations Clause (FAR 52.216–19; 16.505(b)) which read in pertinent part as follows:

a. Minimum Order. When the Government requires supplies or services covered by this contract in an amount of less than _____, the Government is not obligated to purchase, nor is the contractor obligated to furnish, those supplies or services under this contract.

b. Maximum Order. The contractor is not obligated to honor:

(1) Any order for a single item in excess of *amount as specified in contract schedule.*

(2) Any order for a combination of items in excess of *amount as specified in contract schedule.*

(3) A series of orders from the same ordering office with *30* days that together call for quantities exceeding the limitation in subparagraph (1) or (2).

Under Schedule B of the proposed contract a variety of unscheduled grounds maintenance services were set forth e.g., mowing, trimming, edging; pruning shrubs, hedges and trees; snow removal; seeding and sodding; tree removal; shrub removal; clean drainage structure; till tree lines and install snow fence.[1] Only three of the work items on Schedule B are involved in this case. As to these three unscheduled work items, the contract provided in pertinent part as follows:

---

1. These items were deemed "unscheduled" because they were required to be performed by plaintiff only when and if the Contracting Officer issued a work (delivery or job) order directing that the work or service be done.

## Schedule B

Unscheduled Requirements—Contractor will provide grounds maintenance services when directed by the Contracting Officer in accordance with the Performance Work Statement, Section C, Technical Exhibit # 2.

| Item No. | Supplies/Services | Est Qty. | Unit | Unit Price | Total Amount |
|---|---|---|---|---|---|
| 0004 | Base Industrial | | | | |
| 0004AA | Mowing/Trimming—Improved Grounds | 21000 | AC | $_____ | $_____ |
| 0004AB | Mowing/Trimming—Semi–Improved Grounds | 13600 | AC | $_____ | $_____ |
| 0004AC | Mowing/Trimming—Select Unimproved Grounds | 500 | AC | $_____ | $_____ |

The materials suggest that plaintiff was performing some landscaping work on the Base prior to submitting a bid on Sol. B0027, but, ostensibly had never before performed a government contract involving mowing. Plaintiff's company specialized in landscaping and her prior experience had been confined to landscaping work. Based on her prior landscaping experience on the Base, her familiarity with the soils on the Base and surrounding areas, she felt this experience together with common sense qualified her to bid on Sol. B0027. She further relied on what she saw on the site visit in her bid preparations. Moreover, she wanted to gain access to the Base's grounds maintenance business. Her bid on Sol. B0027 was her first effort to obtain a grounds maintenance contract involving mowing with the Base. She felt this grounds maintenance contract would supply jobs and furnish stability to her business after having experienced two years of diminished income as a result of drought in the area.

Upon receipt of Sol. B0027, plaintiff spent some 160 hours studying the bid package. She had plenty of time to study the solicitation package. She understood she could be required to mow any part of the Base that was covered by the contract, as set forth in Schedule B, pursuant to the contract's ordering clause. The bid package came with instructions to contact Contract Specialist Captain Barfield if she had any questions and she took advantage of this on some occasions. Plaintiff understood, prior to bidding, that she would mow only lands specified in work or job orders to be issued by the Contracting Officer and only upon receipt by her of such orders. She also understood that she could be required to mow any part of the Base covered by the contract within 3 days after receipt of a work or job order. She also was aware that she could be given a job order to mow hundreds of acres at one time, but felt the issuance of a job order for a large number of acres would be subject to the rule of reasonableness. Plaintiff makes no complaint that any job order issued to her under the contract in question was unreasonable. Plaintiff knew if she found any discrepancy in the solicitation package she could call the Contracting Officer for clarification. After 160 hours reviewing the solicitation package she found no discrepancies. She asked no questions about the acreage of the various unscheduled work items set out in Schedule B of the contract documents.

Prior to preparing her bid, plaintiff and other prospective contractors, went on a site visit of the Base for the purpose of inspecting, *inter alia*, all the areas they would be required to mow under the contract. During the site visit, neither plaintiff nor any one else asked any specific questions regarding the acreage of any of the areas which were pointed out to them as possible work or job mowing orders under the contract.

Plaintiff submitted the following bid on the three Unscheduled Requirements which are at issue to this case:

### Schedule B

Unscheduled Requirements—Contractor will provide grounds maintenance services when directed by the Contracting Officer in accordance with the Performance Work Statement, Section C, Technical Exhibit # 2.

| Item No. | Supplies/Services | Est Qty. | Unit | Unit Price | Total Amount |
|---|---|---|---|---|---|
| 0004 | Base Industrial | | | | |
| 0004AA | Mowing/Trimming—Improved Grounds | 21000 | AC | $ .79 | $16,590.00 |
| 0004AB | Mowing/Trimming—Semi–Improved Grounds | 13600 | AC | $ .75 | $10,200.00 |
| 0004AC | Mowing/Trimming—Select Unimproved Grounds | 500 | AC | $1.60 | $ 800.00 |

Plaintiff's bid was based on an estimate of 22 mowings per year. This estimate was a subjective determination by plaintiff.

Plaintiff attended the bid opening and realized she was the low bidder. Because her bid was so much lower than the second lowest bidder, her first reaction was that she had "left a lot of money on the table." However, she felt confident she could perform the work for the bid figures she submitted. She rechecked her figures, found minor errors but nothing major, so she concluded she would not changes her bid figures.

Because of the significant disparity between plaintiff's bid and the second lowest bidder, the Air Force asked plaintiff to verify her bid in writing. Plaintiff did so in a letter dated November 17, 1989. Plaintiff was unconcerned about her low bid because she felt she had spread her fees and costs among the various work items to maximize her income potential.

The Air Force, however, was still concerned about her low bid, and called for a meeting—which was held on January 9, 1990. At this meeting, plaintiff was asked to review her bid figures line by line to ensure that she and the Air Force had a "meeting of the minds." Plaintiff was offended that her calculations were being questioned and felt that a line by line analysis of her bid was unnecessary because she looked at the contract as an overall project not as an item by item contract. Accordingly, she did not bid with the idea of a "tremendous amount of profit on each and every item." She was questioned, *inter alia*, on her bid of $.79 per acre for mowing on "Line Item 0004AA Mowing/Trimming—Improved Grounds" where the second lowest bidder's figure was $2.00 per acre. Plaintiff agreed with the Air Force that if there was an error in the bid schedule, the unit price she bid would prevail. Plaintiff advised the Air Force that there would be "no problem" in performing the contract as bid. Plaintiff at this meeting or at any time prior thereto, raised no question about the acreage to be mowed under the contract.

Plaintiff was awarded the grounds maintenance contract on March 15, 1990. Generally, the mowing season in Grand Forks, North Dakota was rather short because of the weather. While grass cutting could be requested any time after April 15, it was generally in June when mowing was first requested on the Base.

In considering the issuance of job orders, relative to the first time use of a requirements contract, Base contract officials determined that it would make the issuance of job orders easier by identifying the various areas on the Base which required mowing by zone numbers and by establishing an estimate of acreage in each zone. As indicated earlier, prior mowing contracts on the Base were let as firm-fixed price contracts. Acreage mowed was not the basis for determining the amount of payment due the contractor. This new process would make it easier and clearer for the Base to indicate the required work orders and would make it easier and definitive for plaintiff to carry out those work orders. Further, it would enable the Base to give plaintiff proper credit for each acre mowed under the contract and thus facilitate the payment process. The original solicitation drawings or maps which were part of the bid package did not contain thereon zone or mowing acreage figures. In order to obtain acreage measurements for each zone, Base personnel inspected and walked each zone with a measuring device to compile the acreage figures. Accordingly, the solicitation drawings or maps were replaced by revised drawings or maps with zones and acreage delineations thereon. This was accomplished by the issuance of Modification P00004 on June 13, 1990. These maps had a Revision Date of May 1992 and were designated "Rev. 1". Plaintiff acknowledged receipt of this

Modification on June 14, 1990. Under this modification, the mowing requirements were establish as follows:

| | | |
|---|---|---|
| Improved Grounds | 18 zones — | 1042 acres |
| Semi–Improved Grounds | 5 zones — | 422 acres |
| Select Unimproved Grounds | 4 zones — | 89 acres |

It is important to bear in mind that the contract was awarded on March 15, 1990 and that no job orders were issued under the contract until after June 14, 1990. Modification P00004 was in place when the first job order was issued. This sequence, the court believes, has colored plaintiff's view that the original solicitation contained maps with zone and acreage delineations.

Plaintiff performed mowing services during the 1990 and 1991 mowing seasons under the contract, as amended by Modification P00004. During the course of performing the contract plaintiff received several discrepancy notices and cure notices informing plaintiff, *inter alia*, that work orders had not been completed within the required three days. However, plaintiff never had any money deducted because of delays in mowing. Plaintiff also felt her company should be completing the work in a more timely manner and wondered if it was the company's fault. Plaintiff realized that while her foreman was good at overseeing one job, he could not manage more than one job at a time.[2]

By letter dated August 13, 1991, plaintiff received a cure notice relative, *inter alia*, to untimeliness (3 days work requirement) in performing certain job orders. By letter dated August 21, 1991 plaintiff responded thereto. Among other things she questioned the measurement of 352 acres for zone 20 of Semi–Improved Grounds. She advised that her measurement for zone 20 totaled 574 acres. She requested that the Base confirm her measurements. She also stated in this letter that "(W)hen the contract was bid, the government provided me with maps indicating the acreage upon which I should base my bid. These maps indicated that zone 20 contained 352 acres. I have now determined that zone 20 actually contains 574 acres."

Plaintiff's remeasurements as compared with the acreage set forth in Modification P00004 are as follows:

*Improved Grounds:* Modification P00004 set forth 1042 acres. Plaintiff's new measurements set forth 1157 acres, a difference of 115 acres.

*Semi-Improved Grounds:* Modification P00004 set forth 422 acres. Plaintiff's remeasurements set forth 657 acres, a difference of 235.5 acres.

*Select Improved Grounds:* Modification P00004 set forth 89 acres. Plaintiff's remeasurements set forth, a difference of 7 acres.

It is interesting to note that these differences, which totaled 357.5 acres, comprise the basis for plaintiff's claim. Modification P00004 was issued on June 13, 1990 long after plaintiff's bid was submitted in November 1989 and months after the contract was awarded plaintiff on March 15, 1990. It is difficult to see how Modification P00004 acreage figures can be relied on in late 1989 for compilation of plaintiff's bid when such figures were not compiled until May or June 1990.

After plaintiff and Base officials remeasured each and every zone of the three unscheduled work requirements area, i.e., Improved Ground, Semi–Improved Ground and Select Unimproved, they reached an agreement that the difference in total acreage between Modification P00004 and the remeasurements amounted to 270 acres, i.e., there were 270 additional acres listed under Modification P00016 than were listed under Modification P00004 relative to all three of the unscheduled requirements of the contract.[3]

---

2. During 1990, plaintiff used 12 different employees at various times to perform the mowing portion of the contract. Ron Schultz was foreman of the mowing crew. During 1991, plaintiff used 18 different employees at various times to perform the contract. Schultz was no longer with the company and Leroy Kukowski was the new foreman. Of the 18 employees used during the 1991 mowing season 14 were new employees to the contract. Only four employees carried over from the 1990 mowing season.

3. The agreement represented a sensible compromise. There were differences between plaintiff's measurements and the Air Force's measurements, but these differences were resolved, reflecting a realization by the parties that estimating acreage under the circumstances was not an exact science.

Following the issuance of Modification P00016, signed by plaintiff on June 5, 1992, which resolved the acreage differences between the parties, plaintiff on, September 9, 1992, submitted a claim to the contracting officer for the "actual costs" it incurred due to the difference in acreage between Modification P00004 and Modification P00016 for mowing work performed in 1990 and 1991. The claim, as submitted totaled $20,594.69. In this claim, plaintiff estimated the cost differential between the work requested per the job orders issued by the Base and the work actually performed, as well as the costs for "additional" manpower, equipment, and fuel.

Plaintiff arrived at her estimated damage figure by subtracting the acreage on Modification P00004 from the acreage she measured and multiplying the difference by 22, her estimate of the number of weeks in the mowing season, multiplying that result by a percentage figure she calculated as reflective of the increase in area she mowed from the area set forth in the work orders issued to her.[4]

Plaintiff's estimated claim was not reasonable. During 1990 and 1991, for example, plaintiff never mowed any zone more than fourteen times (not twenty-two times as estimated by plaintiff). Plaintiff concedes this fact. Indeed, some zones were mowed as few as three times.

More importantly, the job orders actually issued during 1990 and 1991, even with the agreed upon acreage figures in Modification P00016, did not require plaintiff to mow acreage that exceeded the maximum number of acres that the Air Force was permitted to order under Schedule B and the contract's ordering clause. In other words, plaintiff's workload for the work years 1990 and 1991, the years in issue, never exceeded the estimates set out in Schedule B of the contract.

Plaintiff concedes this fact. Plaintiff also concedes that the Air Force correctly ordered all mowing in accordance with the contract's ordering clause. Under Schedule B of the contract, the estimated number of acres that plaintiff could be required to mow during each year at the bid prices plaintiff set forth in her bid submission were 21,000 acres (Improved Grounds), 13,600 acres (Semi–Improved Grounds) and 500 acres (Select Unimproved Grounds) or a total of 35,-100 acres per year. The actual total acreage mowed by plaintiff for 1990 was 11,429.5 acres and for 1991 was 13,085.5 acres.

Plaintiff's claim to the contracting officer was also excessive. It was based on estimated mowing and not on actual mowing. Plaintiff was requested by the Air Force to recalculate her figures using the actual acres mowed.

On September 25, 1992, the contracting officer denied plaintiff's claim in pertinent part as follows:

1. This letter is in response to your letter dated 9 Sep 92, requesting the Government to compensate you for the financial impact incurred (beyond the line item price) for the mowing acreage difference based on the corrected drawings.

2. The Government hereby denies your claim for compensation in its entirety. While the Government acknowledges (although still pending legal review) that it may have a duty to compensate you for actual acreage mowed based on the unit line item price, it does not have a duty to compensate you for any speculative amounts beyond that price. If the scenario was reversed (i.e. mowing acreage understated) I am convinced that you would not feel any obligation, and understandably so, to reimburse a customer an amount for

4. For example, under Modification P00004 1042 acres was estimated to be subject to job orders for Improved Grounds work. Plaintiff estimated these acres would be mowed 22 times during each mowing season (1042 × 22 = 22,924). It is interesting to note that their 22,924 acre figure exceeded the estimated bid figure of 21,000 acres set forth in Schedule B of the contract and on which plaintiff bid $.79 per acre. The figure 22,924 acres was multiplied by 11 percent—a percentage figure that represented to plaintiff the percent of the acreage increase as reflected in her remeasurement figures (11% × 2294 = 2521.64 acres). Plaintiff's damage claim for the increased acreage relating to Improved Grounds was thus determined to be $1,992.00 per season (2521.64 × .79). Similar computations were made by plaintiff relative to the Semi–Improved and Select Unimproved work items.

any more than the actual acreage in error multiplied by the unit price.

3. Additionally, per subject contract, the Government is not limited as to the number of acres in a given day that it can issue job order(s) for mowing. Thus, one job order, or any combination of job orders, can be issued in a single day for a total of 500, 750 or even more acres for mowing and would have to be completed within the required 3 workdays. As you are well aware, this has been the requirement, with no limitation in amount of acreage, since you bid on this contract. I'm sure, as a prudent contractor, you *must* have or *should* have included within your bid price the necessary manpower and equipment to account for the fact that you could be issued a job order for a large amount of acreage to be mowed. It would be unreasonable to assure that a contractor would not account for this possibility, based on the contract specifications when you bid, within their bid price. It is a risk (i.e. large portion of base acreage requiring mowing within required 3 day time frame) that any contractor would be sure to build into their bid price.

On September 28, 1992, by Modification P00018, agreed upon by the parties, the Air Force paid plaintiff $2,219.16.[5] This amount reflects payment for the actual acres plaintiff mowed in 1990 and 1991, but was not paid for, at the line item price bid by plaintiff and reflected on Schedule B of the contract as amended. Accordingly, plaintiff was paid in full for all contract work. The above Modification also provided, in pertinent part, as follows:

C. IN CONSIDERATION OF THE MODIFICATION AGREED TO HEREIN AS COMPLETE EQUITABLE ADJUSTMENT FOR THE CHANGES DESCRIBED ABOVE, THE CONTRACTOR HEREBY RELEASES THE GOVERNMENT FROM ANY AND ALL LIABILITY UNDER THIS CONTRACT FOR FURTHER EQUITABLE ADJUST-

MENTS ATTRIBUTABLE TO SUCH FACTS OR CIRCUMSTANCES GIVING RISE TO AFORESAID CHANGES. (NOTE: THE CLAIM CURRENTLY PENDING FOR COMPENSATION FOR FINANCIAL IMPACT INCURRED BEYOND THE LINE ITEM PRICE DUE TO THE MOWING ACREAGE DIFFERENCE IS EXEMPT FROM THIS RELEASE OF CLAIMS)

Plaintiff maintains that there was a mistake in the represented land acreage to be mowed set forth in delineated zone acres contained in the solicitation maps or drawings presented for bid purposes. Defendant responds that there were no mistakes in the solicitation documents because the solicitation as presented to bidders did not contain any zone delineation on the maps or drawings, nor did it contain any zone acreage figures on said maps or drawings. In fact, defendant states, the solicitation package and proposed contract provisions set forth only annual estimates of acres to be mowed in Schedule B of the proposed contract, on which Schedule bidders were to submit their bids relative to the various items of Base grounds to be mowed.

Plaintiff's claim is based, she contends, on the inaccurate acreage set forth on maps which accompanied the solicitation for bids, and on which she relied in calculating her bid. Plaintiff concedes that she was not misled by what any base official said or did not say. Defendant answers that plaintiff could not have relied on inaccurate maps at the time she prepared her bid, because the maps which contained the inaccurate acreage figures she relies on where not available at the time she prepared her bid prior to November 17, 1989 since these maps were prepared in May or June 1990 and transmitted to plaintiff by Modification P00004 and received by plaintiffs office on June 14, 1990 after the contract had been awarded plaintiff on March 15, 1990. Modification P00004, defendant avers, made no changes in the areas to

---

5. After September 28, 1992, the Air Force again reviewed plaintiff's claim and concluded that the Air Force still owes plaintiff $115.24 for acres mowed at the line item price set forth in Schedule B of the contract. The Air Force advises that it remains willing to pay this amount to plaintiff. Plaintiff should contact the appropriate contract official at the Grand Forks Air Force Base to obtain the above $115.24 payment.

be mowed, nor were the contract's estimated acreage figures set forth in Schedule B of the contract changed.

Plaintiff submitted a second certified claim to the contracting officer on September 21, 1993 seeking to recover a total of $355,000 as "impact damages." Plaintiff sought $75,000 because she "has been forced to maintain fifty-six percent more acreage than [she] originally contracted for...."[6]. Plaintiff also sought $20,000 for claim preparation,[7] $100,000 for loss of business,[8] 10,000 for additional maintenance on equipment, $50,000 for lack of good faith in the attempts made to resolve the situation,[9] $50,000 for breach of contract,[10] and $50,000 for delay for the Air Force's failure to exercise its duty and obligation to equitably address the contractor's claim in a timely manner.[11]

By decision dated January 10, 1994, the contracting officer denied plaintiff's claim. This decision stated in pertinent part as follows:

> a. There were no misstated land acreages in the solicitation. The solicitation did not indicate any acreage for the respective land areas. Only an annual estimate of acres to be mowed was given. Those figures were listed on the bid schedule as unscheduled requirements and in TE 2, Workload Estimates. The actual amount was to be determined by an accumulation of acreage in complying with job orders issued. The numbers you indicate as included with the solicitation were not provided until after award. They were included with modification P00004. There are two errors however, in the numbers given in your claim. The total for improved land areas shown on the maps provided with P00004 is actually 1027, not 1042 (area 13 is 65 versus 80). The correct acre total as provided in mod P00016 is 1160, not 1157 (area 22 is 86 versus 83).
>
> b. Revised acre amounts were provided *after* award and were jointly agreed to and made a part of mod P00016, and subsequently compensated by mod P00018. The maps furnished and incorporated into the contract with modification P00004 did revise what the government initially thought the acreage to be, and some of the

---

6. It would appear that plaintiff's breach of contract claim ($50,000) and plaintiff's separate claim for $75,000 because she was forced to maintain 56% more acreage than she originally contracted for are duplicative. One or the other is subject to dismissal in any event.

7. Costs of preparing claims are not connected with the performance of the contract and thus are not compensable as damages for breach of contract. *Dale Constr. Co. v. United States*, 161 Ct.Cl. 825, 831, 1963 WL 8486 (1963); *see* FAR, 48 C.F.R. § 31.205–47(f)(1) (1996).

8. Even at common law, there would be no breach of contract recovery for general loss of business since such damages are deemed too remote and consequential. *William Green Constr. Co., Inc. v. United States*, 201 Ct.Cl. 616, 626–27, 477 F.2d 930, 931–37 (1973).

9. The undisputed chronological facts set out above show these claims to be without merit. Plaintiff has offered nothing by way of document's or other materials which by inference or otherwise support allegations of bad faith or failure to promptly, properly, and timely consider plaintiff's claim by the contracting officer. Modification P00016, which provides the impetus for plaintiff's claims was issued on or about June 5, 1992. Plaintiff submitted the first claim for $20,-394.69 to the contracting officer on September 9, 1992. On September 25, 1992, the contracting

issued its decision on said claim. On September 28, 1992 Modification P00018 was issued implementing the September 25, 1992 decision wherein plaintiff was paid $2,219.16 on its claims which amounts represented the payment at bid prices for all actual acres mowed by plaintiff in 1990 and 1991/2 for which she had failed to receive payment. Plaintiff submitted her second claim for "impact damages" to the contracting officer on September 21, 1993 for $355,000, which claim was denied entirely on January 10, 1994. Plaintiff filed suit in this court on December 5, 1994. The above chronology, undisputed, does not show that the contracting officer acted in bad faith or failed to properly, promptly and equitably, deal with plaintiff's claims. There is a presumption that government officials perform their duties in a fair, proper and good faith manner. *Librach v. United States*, 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959). No allegations in plaintiff's complaint or in her submissions, giving plaintiff all favorable inferences on the matters she pleaded and alleged, challenge this presumption and as a result the above presumption remains solid, steadfast and decisive on these matters of good faith and prompt, proper, fair, and timely consideration of plaintiff's two claims.

10. *See* Footnote 6, *supra*.

11. *See* Footnote 9, *supra*.

acreage amounts reflected therein were wrong. However, the maps provided with the solicitation did not include any acreage information. Since the mowing was an un-scheduled requirement, the improved, semi-improved and un-improved areas only were outlined. The acres to be mowed were only shown as annual estimates on the bid schedule and in TE 2, Workload Estimates. They accurately reflected where the respective improved land, semi-improved land, and un-improved land was located on the base.

c. You were compensated for the discrepancy in line prices due to incorrect land areas by modification P00018 to the contract. In that modification, the acreage upon which you had been paid was compared to the actual number of acres and the differences paid to you. You were determined to be owed $2,219.16 as a result of the difference. Upon review, it is now noted that the 1042 and 1157 acreage amounts were used in the calculations. When correcting the payment computations based on the proper acre amounts of 1027 and 1160, we still owe you $115.24. There are 4 pages of computations preceded by a summary page attached to show you how this was calculated. As it relates to an increase in your work load, the annual total acreage done remains well below the amount that was estimated in the bid schedule and the Work Load Estimate. To reiterate, your workload never exceeded the estimate in the solicitation upon which you bid.

d. You next claim you were forced to buy new equipment and work overtime to maintain the grounds. At the time of solicitation, the contract line item for mowing of improved grounds reflected an annual total of 21,000 acres. The attached documents also reflect the total acres mowed for FY 90 and FY 91. Note they came to 9,517 and 10,545. Your basis seems to be that the annual acreage amounts should be the base area times 22 mowings, i.e., 1157 (actually 1160) times 22 equal or 25,454 acres. Such a calculation is without merit. The work was accomplished by job order and no area was mowed more than 14 times (varied widely from 3 to 14). The

number of annual mowings will vary depending on weather, base requirements (one area more visible than another), and money the AF has available, etc. The contract is laid out as a requirements contract, and when a requirement is generated, you are issued a job order. The estimates given within the solicitation are just that. The same applies to the semi-improved and un-improved areas.

Plaintiff filed its complaint in this court on December 5, 1994 seeking recovery of $355,-000 because of the government's alleged breach of contract. The elements of plaintiff's claim in this regard were discussed above in the text and related footnotes 6–11.

## DISCUSSION

Only the defendant moves for summary judgment in this case. Plaintiff opposes this motion on the ground that there is a dispute about a material issue of fact, i.e., whether the solicitation on which plaintiff based her bid contained maps (drawings) which identified by zone and acreage figures those areas subject to mowing job orders.

Summary judgment is appropriate when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Disputes over facts which are not outcome determinative under governing law will not preclude the entry of summary judgment. The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. "Where the record taken as a whole could not lead a rationale trier of fact to find for the non-moving party, there is no 'genuine issue for trial'...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Further, the dispute sought to be subjected to trial must comport with common and economic sense. *Id.* Summary judgment is appropriate relative to a dispute about a material fact being genuine if the evidence is such that a reasonable jury could not return a verdict for the non-moving party. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91

L.Ed.2d 202 (1986). At the summary judgment stage, however, it is not the court's function to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. at 2510. Too, all facts must be construed in a light most favorable to the non-moving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, at 587, 106 S.Ct. at 1356. As the moving party, defendant can discharge its initial burden of demonstrating the absence of any genuine issue of material fact by pointing out to the court the absence of evidence to support plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 324, 106 S.Ct. 2548, 2552, 2553, 91 L.Ed.2d 265 (1986). To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. As the Federal Circuit stated: " '[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.' " *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988) (brackets in original) (*quoting Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted), and citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

While a trial court should act with caution in granting summary judgment when a non-moving party asserts in opposition the existence of an issue of disputed fact, summary judgment is, depending on the presentations of the parties, appropriate where the court believes that it is a better course to follow than to proceed to a full trial. *See, Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

I

The contract in issue was a requirements contract. Under this contract, plaintiff agreed to satisfy all of the mowing requirements at the Grand Forks Air Force Base for the years 1990 and 1991. The contract would be violated if either the Air Force did not have all its mowing requirements performed by plaintiff or if the plaintiff failed to satisfy all of the Air Force's mowing needs. The consideration that makes a requirements contract binding is the promise of the Air Force to have all its mowing requirements serviced by plaintiff and plaintiff's promise to satisfy those requirements. *Modern Systems Technology Corp. v. United States*, 979 F.2d 200, 205 (Fed.Cir.1992). Plaintiff had a right to rely on this Air Force obligation. It is conceded that both parties kept their promises under the contract in this regard.

The contract incorporated the Federal Acquisition Regulation (FAR) requirements clause which provided in pertinent part as follows:

> This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment. (FAR § 52. 216–21(a)).

The solicitation on which prospective bidders were to base their bids set forth in Schedule B the maximum number of acres that plaintiff agreed she would stand ready to mow when called upon to do so by the Air Force. Schedule B is set forth at p. 439, *supra.* For example, plaintiff agrees that during 1990 and 1991 she could be required to mow 21,000 acres of Improved Grounds each year. Plaintiff concedes she was never required to mow over 21,000 acres per year. Indeed, plaintiff concedes she was never required to mow more than the estimated quantities set forth in Schedule B of the contract covering mowing services. Defendant contends that on these undisputed facts alone, it is entitled to summary judgment.

The contract also contained an ordering provision that established the maximum allowable acre order that could be issued at

any one time by the Air Force. For example, the Air Force could not issue an order to plaintiff to mow over 21,000 acres. Under the requirements contract, plaintiff concedes, she agreed to accept and mow any order of 21,000 acres or under. The Air Force also could issue an order to plaintiff to mow 800 acres.[12] Plaintiff does not challenge the issuance or contents of any delivery orders for mowing during 1990 and 1991.[13] Plaintiff makes no complaint that any job order issued to her in 1990 and 1991 was unreasonable.

Plaintiff was, on occasion, during 1990 and 1991 issued deficiency notices because of her failure to comply with delivery orders within the three days required for performance. However, she was never penalized for any such deficiencies.

Under the requirements contract, plaintiff assumed the risk that the Air Force would place few or even no orders over the life of the contract. In such a case, plaintiff would have suffered a much greater loss and the Air Force would have had no obligation to plaintiff. It appears in preparing its bid, plaintiff planned to perform delivery orders involving acreage much smaller than permitted under the contract. In this regard, however, plaintiff assumed the risk that her planning on any delivery order, large or small, would be sufficient. In bidding on this requirements contract, plaintiff assumed responsibility for allocating resources to perform all delivery orders, regardless of the acreage size of the order, as long as any order did not exceed the maximum acreage

amount specified in Schedule B of the contract. In fact, as indicated above, no delivery order issued during 1990 and 1991 exceeded these maximum amounts.

Plaintiff does not challenge the viability of the estimated quantity acreage figures set out in Schedule B of the bid solicitation for 1990 and 1991.[14] For example, for 1990, Schedule B estimated that 21,000 acres were subject to possible delivery orders. Plaintiff offered to provide mowing services for these 21,000 acres at a bid price of $.79 per acre for a total bid price $16,590 (.79 × 2100 acres) covering Improved Grounds. It is obvious that the 21,000 estimate was for bidding purposes.

Plaintiff now claims that she relied on the 1042 acre figure in performing her bid on the Improved Grounds work item. This was the figure set forth in Modification P00004, issued in June 1990. It is clear from the record that this figure was not intended for bidding purposes but was established for payment purposes. As indicated above, the 1042 figure did not surface until after plaintiff had submitted her bid and had been awarded the contract. Utilizing this figure, plaintiff claims she multiplied the 1042 acre figure by 22, the number of times she expected to mow this acreage. This calculation would have produced a total acreage figure for bid purposes of 22,914 acres. This figure is obviously in excess of the maximum estimated quantity figure of 21,000 acres. This produces a clearly patent ambiguity in the contract on a significant contract matter.

---

**12.** Plaintiff concedes that she could be required to mow almost the entire Base if the Air Force chose to issue such an order subject only to the rule of reasonableness, since she was required to complete a delivery within 3 days of the receipt of any order. In fact, however, the delivery orders issued in 1990 and 1991 were far less than the maximum orders that could be issued under the contract's ordering clause.

**13.** In 1990 and 1991, plaintiff was required to mow 18 zones of Improved Grounds. The acreage in these zones ranged from five acres to 180 acres. Fourteen of the zones were under 100 acres. During these years, plaintiff was required to mow five zones of Semi–Improved Grounds. The acreage in these five zones was 352 acres, 30 acres, 15 acres (two zones), and 10 acres respectively. During these years, plaintiff was required

to mow four zones of Select Improved Grounds. The acres in these four zones was 59 acres, 15 acres, 10 acres and five acres respectively. Of the total of some 27 zones mowed during 1990 and 1991, only five zones involved over 100 acres.

**14.** The contract provided that the quantities or acreage required by the contract specified in Schedule B were estimates only and were not purchased by the contract and that if these requirements did not result in orders in the quantities described as estimates, that fact would not be the basis for an equitable price adjustment. Plaintiff recognized the thrust of this provision and correctly did not challenge the estimates set out in Schedule B. *See Webco Lumber, Inc. v. United States*, 230 Ct.Cl. 457, 464–465, 677 F.2d 860, 864 (1982).

Under these circumstances, assuming again the validity of plaintiff's contention, plaintiff would clearly have been under a duty to call such a patent ambiguity, relating to the three mowing work items in dispute, to the attention of appropriate Air Force officials before submitting her bid. She did not do so. As a result, she cannot now "bridge the crevasse in [her] own favor." *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963); *Interstate General Gov't Contractors v. Stone,* 980 F.2d 1433, 1435–36 (Fed. Cir.1992).

In plaintiff's brief, plaintiff presents as an issue the question of "[w]hether the Government required plaintiff to perform work beyond that required by plaintiff's contract with the Government for which plaintiff has not been paid." The undisputed answer to this question is "No." Plaintiff has been paid in full for every acre it mowed under the contract.[15] Moreover, plaintiff was required to mow far less than the number of acres it agreed to mow under the contract.

 Plaintiff ignores the terms, conditions and ramifications of the requirements contract she entered into with the Air Force. Plaintiff does not challenge the quantity estimates on which all prospective bidders focused their bids, e.g., 21,000 acres of Improved Grounds. Plaintiff does not contend that the Air Force violated any provision of the contract in question. Plaintiff concedes she has been paid the bid price for every acre of mowing she performed.[16] On the undisputed facts discussed above, under plaintiff's requirements contract, whether the maps in question contained acreage and zone figures or not, plaintiff is not entitled to any recovery in this case. Even if this were not so, plaintiff would still not be entitled to recovery because of her failure to call a patent ambiguity, created by her contentions, to the attention of the Air Force prior to submitting her bid.

II

*Assuming arguendo* that the disputed issue is outcome determinative and that plaintiff had no duty to call the Air Force's attention to the apparent bid ambiguity, then the court must determine whether that disputed issue is a genuine issue of fact for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

Plaintiff contends that the solicitation she received and on which she submitted her bid in late 1989 contained maps on which the areas to be mowed were outlined in black, numbered by zone, and contained an acreage figure within each zone. Defendant denies this fact. Plaintiff argues that this dispute is genuine and material sufficient to justify denial of defendant's motion for summary. This issue then is whether this dispute is genuine so as to require a trial.

Generally a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2509. It is "not required that the disputed fact be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dis-

---

**15.** It is true that some work orders issued in 1990 and 1991 did not reflect the correct acreage for some of the designated zones. However, these errors were corrected when called to the Air Force's attention and plaintiff was later paid for all acreage she mowed under contract Modification P00018. In those limited circumstances, plaintiff was not timely credited for work performed but plaintiff's claim is not based on this observation.

**16.** Plaintiff's claim, in essence, is that her work planning assumptions were disrupted because she had to mow more acreage than she expected. For example, plaintiff contends she expected to mow only 1042 acres of Improved Grounds but discovered she was actually mowing 1157 acres, a difference of 115 acres. While plaintiff was paid for mowing these additional 115 acres, she claims the impact on her expected mowing planning was disrupted. The simple answer to this contention is the realization that under a requirements contract plaintiff assumes the risk that job orders could be issued calling for the mowing of as little as a few acres to as many as 21,000 acres. Accordingly, plaintiff in submitting its bid, should have realized that she would have to be prepared to mow areas in increments of from one to 21,000 acres in one or in a number of job orders. But this was a risk she assumed under the requirements contracts in return for the Air Force's obligation to have all Base mowings performed by plaintiff. Plaintiff concedes that under the contract she could have been required to mow more than 1042 acres.

pute be shown to require a jury or judge to resolve the parties differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). However, evidence proffered by the party seeking a trial must be significantly probative. *Id.* at 290, 88 S.Ct. at 1593; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

In the case at bar, defendant, the moving party has carried its burden under Rule 56(c) that it is entitled to summary judgment. Plaintiff, the non-moving party must come forward with specific facts showing there is a genuine issue of fact for trial. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356.

■ Defendant's evidence established that the original solicitation issued in September 1989 did not contain maps with zone and acreage delineations thereon. It supplied the court with copies of the original solicitation from its contract files. Plaintiff on the other hand, concedes she cannot produce the original solicitation which allegedly contained the zone and acreage delineations because she threw them away. Accordingly, plaintiff relies on affidavits and declarations to establish a genuine issue of fact.

As indicated in the facts and discussion above, the Air Force had no zone and related acreage determinations until six months or so after the solicitation was issued and some three months after the contract was awarded. The absence of such delineations required Air Force personnel to delineate on original solicitation maps specific zones to be mowed and to estimate the acreage in these zones. This effort, conducted in May and/or June 1990 was incorporated into Modification P00004, which was issued on June 13, 1990

and plaintiff acknowledged receipt thereof on June 14, 1990. It is the acreage figures determined by the Air Force in mid 1990 that plaintiff contends were part of the original· solicitation issued by the Air Force in September 1989. The contracting officer, in her Declaration, sagely observed that "I would not have modified the contract [in June 1990] to issue these maps [Modification P00004] if the original maps [issued in September 1989] reflected the acreage for each zone." [17]

Plaintiff seeks a trial to present the testimony of four witness who she alleges will testify that the original solicitation maps on which plaintiff based her bid contained zone and acreage delineations. The plaintiff would be the first witness. Excerpts from her deposition were before the court. While plaintiff avers her original bid was based on maps which contained zone and acreage delineations on them, she "cannot swear [ ] that that's how it was because those—I no longer have those maps. I threw them away" (Def's moving brief, p. 56 of the Appendix). But, she added, she could swear to the fact that she had the maps delineating zones and acreage when she started work on the contract. (Id) As indicated earlier, modification P00004 was received by plaintiff on June 14, 1990 before she started ·work on the contract. Her testimony at trial will presumably parrot the above excerpts which support the view that the original bid maps did not contain zone and acreage delineations.

Plaintiff also intends to produce at trial two former employees of plaintiff, Leroy J. Kukowski (Kukowski) and Kristin Muir (Muir). Their affidavits were before the court. Kukowski began working for plaintiff in the Spring of 1991. It is to be noted that plaintiff was awarded the contract in issue on March 15, 1990. Kukowski stated that maps delineating zones and acreage were located

---

**17.** The following scenario most probably explains plaintiff's view that Modification P00004 maps were part of the original solicitation. Plaintiff's bid was submitted in late 1989. She was awarded the contract on March 15, 1990. Because of weather conditions, mowing in North Dakota commenced sometime in June 1990. Because Modification P00004 was issued before any contract work was performed, i.e., before any work order was issued, and because the modifications were delineated on original solicitations maps, plaintiff, and others, mistakenly believed over time that these modifications were part of the original solicitation issued in 1989 and ignored the fact that Modification P00004 and Modification P00016 were revisions 1 and 2 to the original solicitation maps.

on the wall of the company office. As indicated earlier, plaintiff received Modification P00004 on June 14, 1990. This Modification contained, for the first time, zone and acreage delineations. Kukowski has no probative information as to whether the maps on which plaintiff based her bid in late 1989 contained zones and acreage delineations. At oral argument, plaintiff's counsel conceded that Kukowski's "testimony will best speak to the amount of the damages incurred by the contractor." Likewise, the affidavit of Muir shows here lack of personal knowledge relative to the preparation of plaintiff's bid in late 1989. Muir worked for plaintiff from April 1991 to July 1993.

Finally, plaintiff proposes to call Don Hecht (Hecht) as a witness if trial proceedings are permitted. An affidavit signed by Hecht was part of the record in this case. In this affidavit Hecht points out he was the landscape contractor at the Base prior to plaintiff. As indicated earlier, his contract was a fixed price contract and acreage was not the basis for payment. Under his contract, Hecht was required to maintain the grounds on the Base within specified height parameters. Hecht decided if and when the grass required mowing and the Air Force had little flexibility in redirecting Hecht's efforts to areas that might need more immediate attention. Hecht received a fixed price per month for mowing regardless of the number of mowings for any specified area within a given month. Because of these concerns, the Air Force decided to develop a requirements contract.

In the affidavit he signed, Hecht avers that his contract with the Base expired in 1989. In his letter to counsel "returning your affidavit to you signed by me....," Hecht states, "[T]he government canceled our contract early, not due to performance, but to seek a cheaper price...." In this letter, Hecht also states that when the government had inquired of him whether he still had the original bid package, he said he could not recall whether he had the bid package or not. Hecht never produced the original bid package and does not now proffer it as proof that the original bid package contained maps with zone and acreage delineations. While Hecht

states he relied on maps to calculate his bid, it is unclear what maps he was relying on. In the letter to counsel, Hecht suggests that plaintiff may have been given erroneous information by an unnamed Air Force captain. But plaintiff in her deposition stated categorically she was not misled by any Air Force official. Plaintiff claims she relied only on the maps and data covered by Modification P00004 which was issued in June 1990, some three months after the contract was awarded on March 15, 1990. To survive a motion for summary judgment, "[t]he non-movant [plaintiff] may not rest on its conclusory pleadings but, under Rule 56, must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed.Cir. 1984). Hecht's affidavit is at most general, cryptic, and lacking in probative value. It provides no support for the proposition that the maps in the 1989 bid package contained zone and acreage delineations.

Both plaintiff and Hecht stress that it was critical for bid purposes to know the amount of acreage to be mowed. Schedule B of the bid package estimated the acreage to be mowed, e.g., 21,000 acres for Improved Grounds. All bidders were to focus on this estimate for bidding purposes. The requirements contract cautioned that this was an estimate and plaintiff realized that she could be required to mow various acres of land under job orders. The risks of mowing small, medium or large acreage was her burden and this risk would be, or should have been, reflected in her price per acre bid.

The court recognizes the importance of allowing plaintiff a right to a trial on her claim. But that does not mean that she is entitled to a full-dress trial not withstanding the absence of any significant probative evidence tending to support her claim. *See First National Bank*, 391 U.S. at 290, 88 S.Ct. at 1593. Here, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party—the plaintiff. It is most improbable that plaintiff's bid package contained maps that had zone and acreage delineation. It is not reasonable or rational to believe that the Air Force would

take the time, effort and money to prepare Modification P00004 if the zone and acreage delineations were already on the original solicitation maps. Accordingly, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. The evidence before the court is such that it would require a directed verdict for defendant, the moving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511. Summary judgment is the better course to follow in this case than to proceed to a full trial. *Id.* at 255, 106 S.Ct. at 2513.

### III

Based on the above Facts and the Discussion related thereto, the court grants defendant's motion for summary judgment. The clerk is directed to dismiss plaintiff's complaint. No costs.